IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No. 3:10-CR-100 |
| FRANKLIN DELANO JEFFRIES, II, | ) | (PHILLIPS/SHIRLEY) |
| Defendant. | ) | |

## **ORDER OF DETENTION PENDING TRIAL**

This case came before the Court on September 1, 2010, for a detention hearing pursuant to 18 U.S.C. § 3142(f). Assistant United States Attorney Kelly A. Norris appeared on behalf of the Government. Attorneys Ralph Harwell and Jonathan Harwell represented the Defendant, who was also present. The Defendant sought release on conditions, including that he live with his wife and children in Clarksville, Tennessee. The Government sought pretrial detention, arguing that no conditions of release exist that would reasonably assure the safety of the community.

The Defendant is charged [Doc. 2] with one count of transmitting in interstate commerce a threat to injure and kill a Knox County Chancellor. At the detention hearing, the Government played a YouTube video [Exh. 1] depicting a performance by the Defendant that forms the basis of the instant charge. AUSA Norris proffered that the Defendant was scheduled to appear before Chancellor Michael Moyers on July 14, 2010, with regard to an ongoing custody dispute and that Chancellor Moyers had previously admonished the Defendant for cursing in the courtroom. AUSA Norris argued that the threats to kill and to bomb a car contained in the video were directed to Chancellor Moyers because the Defendant states that his song "is for you judge," references the July 14 hearing, and says do not tell

1

me I cannot curse.

AUSA Norris proffered that the Defendant was convicted of misdemeanor harassment in 1997. The Government introduced a military police report [SEALED Exh. 3],[1] which stated that the Defendant was under investigation for the unlawful discharge of a firearm on April 12, 2010. The report states that following an argument with two other soldiers, the Defendant returned to his quarters, retrieved a .38 caliber revolver, and fired it into the air. The report states that alcohol was involved in the incident.[2] The Government proffered that as a result of this incident, which is still under investigation, the Defendant and his family were forced to leave their on-base housing. With regard to alcohol abuse, AUSA Norris stated that the Defendant had reckless driving convictions in 1995 and 1998, which both stemmed from DUI charges. She also proffered that the Defendant attempted to commit suicide by consuming a large quantity of alcohol in April 2010.

The Government proffered that while in a mental hospital, the Defendant wrote a letter threatening to kill his doctor and others. The Defendant's wife gave this letter to his commander at his request. The Government introduced the handwritten letter [SEALED Exh. 4] dated May 25, 2010, and pointed out portions in which the Defendant threatens to choke and kill his doctor. AUSA Norris proffered that the Defendant subsequently attacked a doctor at Cumberland Hall mental health hospital in May or June of 2010.

AUSA Norris stated that the Defendant failed to appear in court in May 2003 and

---

[1] This report was filed under seal because it contains numerous personal identifiers.

[2] The military police report [SEALED Exh. 3] states that the Defendant was administered a breathalyzer test and had a .08 blood alcohol concentration. The report also reflects that the Defendant was investigated for reckless endangerment, drunk and disorderly conduct, and failure to obey a general order requiring the registration of a firearm, but these offenses were not mentioned by the Government at the detention hearing.

escaped from a mental institution in May 2010. She informed the Court that if the Defendant was released, he would be required to report to an Army official every three hours. She acknowledged that the Defendant was not on any type of release at the time of the instant offense.

The Defendant presented the testimony of Tamera Rae Jeffries, James Elbert Ford, Arnold Sanford Nelson, and Candace Jane Sutton. Tammy Jeffries testified that she and the Defendant had been married for nine years and have two children. Before his arrest, the Defendant lived with her and the children in Clarksville, Tennessee. In April 2010, the Defendant was involved in a "gun incident" on post. The Defendant had been drinking at a cookout earlier that evening. While she was getting the children ready for bed, the Defendant went outside to address some neighbors who were "carrying on." Mrs. Jeffries heard a noise outside. The Defendant told her that the noise was firecrackers. The Defendant was not charged with any crime stemming from this incident, but the private organization which manages the on-post housing made the Jeffries family move.

Mrs. Jeffries stated that her husband was hospitalized at Lincoln Trails, a mental health hospital, from April through early May of 2010. He seemed calm to her during this time. After his discharge, he returned home for about one month. During this time he seemed anxious, particularly with regard to a questionnaire he was completing for a medical review board. Mrs. Jeffries said that the Defendant went to the emergency room at the hospital on post for a sinus infection and was "red-flagged" as a mental patient. He was taken from the emergency room to Cumberland Hall, another mental health hospital. While there, the Defendant was angry and upset because he was being held involuntarily. During this time, he wrote a letter. The Defendant was discharged from Cumberland Hall in early June and lived off-post with her and the children.

Mrs. Jeffries testified that the July 9 video was made while she and the children were

in Knoxville.  Mrs. Jeffries stated that one of the Defendant's therapists had advised him to "vent" orally and in song and to create video journals.  Mrs. Jeffries believed that the Defendant was venting in the July 9 video.  She stated that she had never felt that the Defendant was a danger to her and had never see him hurt anyone.  She stated that if he was released, he could live with her and their children.

On cross-examination, Mrs. Jeffires testified that she had glanced through the letter by the Defendant and knew that it contained threats when she delivered it.  She said that she was not outside during the "gun incident" in April 2010.  She said that following that incident, the military police confiscated a .38 revolver and a muzzle loader from their home.  She stated that her husband had received treatment for alcohol abuse and no longer had a drinking problem.  She acknowledged that he had been drinking and was drunk on the evening of the April incident.  Although she described the Defendant as mostly calm, she agreed that he became angry over his child custody case.  On redirect examination, Mrs. Jeffries said that she had spoken with the Defendant every day while he was in custody in this case and that he seemed more calm and not as stressed.  She stated that the Defendant was stressed in early July of this year.  On recross-examination, she stated that the July 9 video was recorded in their house.  She said that she did not know whether the Defendant's custody dispute was still ongoing but that he did not go to the July 14 hearing because he was in jail.

James Elbert "Jim" Ford testified that he had known the Defendant for eighteen years, and he and the Defendant had planned a fishing trip on the day the Defendant was arrested.  Although he did not talk with the Defendant while the Defendant was in the mental institutions, he usually spoke with the Defendant every other day.  Mr. Ford said that the Defendant spoke constantly about his custody dispute and was upset when he talked about it.  Mr. Ford had spoken with the Defendant once since the Defendant's arrest and the Defendant seemed his usual self.  Mr. Ford had never known the

Defendant to fight or to attack anyone. Mr. Ford did not believe anyone would be at risk of being hurt if the Defendant was released.

On cross-examination, Mr. Ford stated that he met the Defendant through his son. Although he had seen the Defendant drink alcohol, he had never seen him drunk. The Defendant was upset and preoccupied with the custody issue because he could not see his daughter.

Arnold Sanford Nelson testified that he is a neighbor of the Defendant's parents and had known the Defendant for twenty-five years. He saw the Defendant occasionally after the Defendant moved from his parents' home. He had never known the Defendant to be violent or seen him in a fight. He believed that no one would be at risk from the Defendant's release. On cross-examination, Mr. Nelson stated that he last saw the Defendant in the spring of this year. He was not aware that the Defendant was involved in an altercation on the military base, had written a threatening letter to his doctors, or had made the instant video. On redirect, he said that he had not spoken with the Defendant while he was in a mental institution, nor did he know that the Defendant had been in a mental institution.

Candace Jane Sutton, the Defendant's sister, testified that she first saw the video that is the subject of the charge against the Defendant when it was linked to her Facebook page. She spoke with the Defendant about the video on the day it was placed on the internet, and it was immediately removed from the internet. She said the Defendant writes crazy songs trying to be funny. A doctor had advised the Defendant to release his anger in his songs as opposed to acting on it. Although the video was based on some true things, she believed the Defendant was venting in the video.

Ms. Sutton stated that the Defendant had previously had a drinking problem. He had not consumed alcohol for ten weeks when he was given tequilla at a party on the day of the incident

5

with the firearm. She stated that she knew the Defendant had been in a mental hospital this year, but she did not speak with him during that time. With regard to his alleged attack on a doctor, she stated that the Defendant had knocked a clipboard out of the doctor's hand because he believed the doctor was not listening to him while taking notes. She saw the Defendant at the jail and he seemed better to her because he was off the medication. She believed that no one would be at risk if the Defendant were released. She had never known the Defendant to fight or to hurt anyone. She has seen him agitated regarding the situation with his daughter.

The Government argued that clear and convincing evidence exists that the Defendant is a danger to the community. First, the Defendant's charged offense is a crime of violence pursuant to 18 U.S.C. §16, which defines a crime of violence as that containing an element of threatened use of force against another. Second, the Government argued that the weight of the evidence as to the Defendant's dangerousness is great, as revealed by the July 9th video, his misdemeanor harassment conviction in 1997, his firing a gun on an Army base in April 2010, and the May 25, 2010 handwritten letter in which the Defendant threatened to kill his doctor. Third, with regard to the Defendant's character and past conduct, the Government argued that the Defendant had a history of making threats and had acted on one of those threats when he attacked a doctor at a mental hospital in the spring of this year. AUSA Norris also stated that the Defendant had a history of alcohol abuse. Fourth, the Government contended that the nature and seriousness of the Defendant's danger to the community was great, as demonstrated by his threats to a judge, his doctors, and others. AUSA Norris argued that the supervisory reporting restrictions that would be imposed by the Army were not sufficient to alleviate his risk of danger because he would be unsupervised in the intervening hours. Moreover, the Defendant consumed alcohol and discharged the weapon in April and committed the instant offense all while

6

living with his wife, with whom he proposes to live if released.

Defense counsel argued that the July 9th video showed the Defendant venting in a stream of consciousness style and did not constitute a threat against any specific person. Although the Defendant was arguably talking about violence in the video, that did not transform the charged offense into a crime of violence. Moreover, if the Defendant were detained, he would likely serve a sizeable amount of any potential sentence while awaiting trial. The Defendant argued that the other alleged instances of threatening behavior cited by the Government deserved little or no weight. The 1997 misdemeanor conviction was remote and was followed by thirteen years of litigation over divorce and custody matters. The alleged gun incident in April 2010 had not resulted in a charge. Any threatening language in the May 2010 letter was conditional and was written when the Defendant was under the influence of medication and was being held involuntarily in a mental hospital after simply going to the emergency room to be treated for a respiratory infection. The purported attack on a doctor at Cumberland involved the Defendant slapping at the doctor's clipboard because the doctor was preoccupied with making notes.

The Defendant argued that his witnesses, who had known him between eighteen and thirty-five years, had all testified that he had never hurt anyone. They testified that the Defendant was greatly improved mentally and emotionally now that he was not taking medication. Mr. Harwell asserted that the Defendant's family ties and ties to the community reveal that he should be released. Furthermore, if he was released, the military would place strenuous conditions on him, including reporting every three hours and wearing a uniform at all times. The Defendant would also be able to continue his evaluation by the medical review board.

Following a detention hearing, a defendant may be detained pending trial if no condition

or combination of conditions exist that will reasonably assure (1) the defendant's appearance as required in court and (2) the safety of the community or any person in it. 18 U.S.C. § 3142(e). In the present case, the detention issue turns primarily upon whether any combination of conditions of release could reasonably assure the safety of the community. The Government must establish the lack of such conditions by clear and convincing evidence.

In light of the evidence presented and the Government's proffer, the Court finds by clear and convincing evidence that no conditions of release exist that could reasonably assure the safety of the community. In making this determination, the Court has considered the factors enumerated in 18 U.S.C. § 3142(g). Factor one looks to the nature and circumstances of the offense charged, including whether it is a crime of violence. See 18 U.S.C. § 3142(g)(1). The Bail Reform Act defines a crime of violence as "an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another[.]" 18 U.S.C. § 3156(a)(4)(A). Here, the charge against the Defendant involves a threat to injure and kill a Knox County Chancellor. Thus, factor (g)(1) weighs in favor of detention.

Second, the Court finds that factor two, the weight of the evidence against the Defendant, also weighs in favor of detention, whether it is viewed as the weight of the evidence of the offense or the weight of the evidence of dangerousness. See 18 U.S.C. § 3142(g)(2); see also United States v. Stone, 608 F.3d 939, 948 (6th Cir. 2010) (observing that factor (g)(2) "goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt") (petition for certiorari filed Aug. 30, 2010). The Court has viewed the July 9 video and finds the weight of the evidence of the charged offense favors detention. Additionally, the weight of the evidence of the Defendant's dangerousness also favors detention. Although actual acts of violence are minimal, the

frequency of threats and disconcerting behavior on the part of the Defendant has escalated in the past six months. The Defendant was forced to move off post due to his firing of a gun during a conflict with his neighbors. The Defendant has required admission to a mental hospital twice. He wrote a letter threatening to kill and choke his doctor at the mental health facility. Finally, he created a video in which he makes threats to kill and to bomb a car. All of these incidents occurred between April and July 2010. The weight of the evidence against the Defendant argues for detention.

The third factor for the Court to consider examines the history and characteristics of the defendant, including "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3)(A). The Court finds that some of these traits favor release, while others argue for detention. The Defendant's character before April 2010, his family ties, his previous employment, his residence in the community, his minimal criminal history, and his lack of a significant record of nonappearance all weigh in favor of release. On the other hand, the Defendant's character and actions since April 2010, his mental condition, recent history of unemployment, lack of financial resources, and alcohol abuse point to detention. Although factor (g)(3)(A) seems equally balanced, the Court observes that the characteristics most relevant to the Defendant's dangerousness favor detention. The Court must also consider whether, at the time of the current offenses, the Defendant was on probation, parole, or pretrial release. See 18 U.S.C. § 3142(g)(3)(B). This is not the case and, thus, this factor argues in favor of release.

Finally, with respect to the "nature and seriousness of the danger to any person or the community that would be posed by the person's release," the Court finds that this factor also weighs

9

in favor of detention. See 18 U.S.C. § 3142(g)(4). The Court finds that the totality of the evidence presented at the detention hearing reveals that the Defendant has threatened a number of people on several occasions over the past six months, that he tends to threaten others whenever he finds himself in stressful situations, and that his threats appear to be escalating. The Court finds by clear and convincing evidence that the Defendant remains a serious potential danger to Chancellor Moyers, other judges who might be involved with his custody case, his ex-wife, and to the community. Thus, the Court finds that factor (g)(4) weighs decidedly in favor of detention.

Moreover, the Court has considered the Defendant's suggested conditions that he live with his wife and children in Clarksville, that he submit to the reporting restrictions imposed by the Army, and that he continue with his evaluation by the medical review board, as well as other possible conditions and finds that none exist that would reasonably assure the safety of certain individuals or the community if the Defendant were released. The Defendant appears to respond to stress by becoming angry, making threats to attempt to affect change, and then taking action. Although the Defendant's mental state appears somewhat improved in the structured environment of custody, if he is released, his structure will decrease, while his stress will only increase. Given the Defendant's tendency to blame others for his problems, the Court finds his release would be a recipe for failure as the Court would be releasing him to the same or a worse situation as he was in when he made the video in July 2010. Furthermore, the parties have not suggested, nor is the Court aware of, the type of mental health treatment that would or could benefit the Defendant to the point of alleviating the Court's concerns about the Defendant's dangerousness.

The Court finds the danger posed to the community from the Defendant's release to be great. Accordingly, the Court concludes that no condition or combination of conditions of release exist

that could reasonably assure the safety of the community. Therefore, the Defendant is **ORDERED** to remain in detention until his trial. The Defendant is committed to the custody of the Attorney General or his designated representative for confinement in a correction facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. The Defendant shall be afforded a reasonable opportunity for private consultations with defense counsel. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility shall deliver the Defendant to the United States Marshal for the purpose of an appearance in connection with a court proceeding.

    **IT IS SO ORDERED.**

ENTER:

    s/ C. Clifford Shirley, Jr.
United States Magistrate Judge