IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:10-CR-100 |
| | ) | (PHILLIPS / SHIRLEY) |
| FRANKLIN DELANO JEFFRIES, II, | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C.§ 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This case is before the Court on Defendant Jeffries' Motion to Dismiss Indictment [Doc. 22], filed on August 30, 2010. The parties appeared for a hearing on the motion on September 16, 2010. Assistant United States Attorneys David C. Jennings and Kelly A. Norris appeared on behalf of the Government. Attorneys Ralph E. Harwell and Jonathan Harwell represented the Defendant, who was also present. The Court, having previously viewed the video evidence in question, heard the arguments of the parties and took the motion under advisement.

**I. POSITIONS OF THE PARTIES**

The Defendant is charged [Doc. 2] with knowingly transmitting in interstate commerce on July 9, 2010, a video of himself containing a threat to kill and injure Knox County Chancellor

1

Michael W. Moyers, in violation of 18 U.S.C. § 875(c). The Defendant asks [Doc. 22] the Court to dismiss the Indictment because the allegations therein do not constitute an offense as a matter of law. Specifically, he contends that the video does not constitute a "true threat," as defined by the case law, because he did not disseminate the video in such a way that a reasonable person would believe that he intended to intimidate Chancellor Moyers into taking a particular action. Instead, he argues that the video was merely his political speech and artistic expression, both of which are protected by the First Amendment.

The Government responds [Doc. 28] that whether the video constitutes a threat under the statute does not turn upon the likelihood of the threatened victim receiving the threat. Instead, the Court must determine whether, at the time the Defendant loaded the video onto YouTube, a reasonable person could believe that the video was being communicated to effect change through intimidation. The Government argues that the present video meets this requirement and, thus, the Indictment properly alleges an offense.

## II. BACKGROUND

Evidence presented at a September 1, 2010 detention hearing reveals that in the summer of 2010, the Defendant and his ex-wife were involved in a protracted custody dispute over their teenage daughter. Knox County Chancellor Michael W. Moyers was scheduled to hold a hearing with regard to this custody dispute on July 14, 2010. The Indictment alleges that on or before July 9, 2010, a video of the Defendant was "posted on the internet website 'YouTube[.]'" The parties played the video for the Court at the detention hearing. The Defendant also filed a CD of this video as an exhibit to his motion. Both parties submitted transcripts of the content of the video in their briefs

2

[Docs. 23 and 28].

The video depicts the Defendant singing, playing a guitar, and talking. It opens with the title "Daughter's Love," and then the Defendant says, "This song's for you, judge."[1] The Defendant begins singing about what he characterizes as "abuse" and being alienated from his daughter by judges, lawyers, and his ex-wife. He sings that he does not care if he has "to kill a judge or a lawyer or a woman" because "this is my daughter we're talking about." Later, he sings "the sh*t needs to stop cause you're gonna lose your job/ And I guarantee you, if you don't stop, I'll kill you[.]" He also sings that he is "telling you right now live on the internet[.]" The Defendant subsequently begins speaking about "Traumatized Foundation.org," which he claims that he started because children are being abused by judges and lawyers. He states that the judges abusing children need to be voted out of office because

> you don't deserve to to be a judge and you don't deserve to live. You don't deserve to live, in my book. And you're going to get some crazy guy like me after [you].
> And I hope I encourage other dads to go out there and put bombs in their g**damn car. Blow 'em up. . . . .

At the end of the video, the Defendant places his face close to the camera and says, "Yeah, look at that. That's the evil. You better keep me on God's side. Do the right thing July 14th." As the Defendant notes in his memorandum, Chancellor Moyers' name is never mentioned on the video.

### III. ANALYSIS

Our Constitution requires that "[n]o person shall be held to answer for a capital, or otherwise

---

[1] The quotations from the video are taken from the transcription the Defendant has set out in his memorandum of law [Doc. 23].

3

infamous crime, unless on a presentment or indictment by a grand jury[.]" U.S. Const. Amend. V. "The indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged[.]" Fed. R. Crim. P. 7(c)(1). As a general rule, an indictment passes constitutional muster if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117 (1974); United States v. Landham, 251 F.3d 1072, 1079 (6th Cir. 2001) (quoting Hamling). An indictment may allege the charges using the words of the statute itself as long as it gives all the elements of the offense "'fully, directly, and expressly[.]'" Hamling, 418 U.S. at 117 (quoting United States v. Carll, 105 U.S. 611, 612 (1882)); Landam, 251 F.3d at 1079. Moreover, the statutory language "'must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged.'" Hamling, 418 U.S. at 117-18 (quoting United States v. Hess, 124 U.S. 483, 487(1888)); Landam, 251 F.3d at 1079.

In the instant case, the Defendant argues that the Indictment fails to charge an offense as a matter of law because it fails to allege that he committed a "true threat," as defined by the case law. The Court will first address whether this issue–that the video in question does not constitute a true threat–is a matter that the Court may decide pursuant to a pretrial motion or a matter reserved for the jury's determination at trial. Second, the Court will look at the substantive question of whether posting this video containing an alleged threat on the Internet website YouTube.com constitutes making a true threat under 18 U.S.C. § 875(c) as a matter of law.

## A. Propriety of Pretrial Determination

"A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." Fed. R. Crim. P. 12(b)(2). Specifically, a defect in the indictment, such as its failure to state an offense, can be challenged before trial. Fed. R. Crim. P. 12(b)(3)(B). Moreover, the Court "may make preliminary findings of fact necessary to decide the questions of law presented by pre-trial motion so long as the court's findings on the motion do not invade the province of the ultimate finder of fact." United States v. Jones, 542 F.2d 661, 664 (6th Cir. 1976). Resolution of a pretrial motion to dismiss the indictment for failure to state an offense is appropriate when the "facts surrounding the alleged offense [are] virtually undisputed and trial of the substantive charges would not substantially assist the court in deciding the legal issue raised by the motion to dismiss the indictment." Id. at 665. In Jones, the appellate court held that the district court properly decided the defendant's motion to dismiss the indictment "because [the motion] raised the legal question of whether [the statute at issue] was intended to apply to interspousal wiretaps" and the facts relating to the issue were "virtually undisputed[.]" Id.

Similarly, in United States v. Levin, the Court of Appeals for the Sixth Circuit determined that "the district court concluded from undisputed extrinsic evidence that a Federal Rule of Criminal Procedure 12(b) pretrial motion to dismiss the indictment was well-taken because the government was, as a matter of law, incapable of proving beyond a reasonable doubt the intent required to convict the appellees of the controversial counts of the indictment which were dismissed with prejudice." 973 F.2d 463, 470 (6th Cir. 1992). The court held this disposition of the case upon a pretrial motion was appropriate because the motion raised "a legal issue, namely the ability of the government to prove intent which was an integral element of [the statute charged] . . . after the trial

5

court had considered undisputed extrinsic evidence." Id.

From these cases and Rule 12(b), the Court distills two requirements for addressing a motion to dismiss the indictment which alleges that the government cannot establish the offense charged as a matter of law: (1) the issue raised must be a question of law and (2) the relevant facts must be undisputed. Levin, 973 F.2d at 470; Jones, 542 F.2d at 665. The undisputed nature of the evidence is an important predicate to a court's determination of a motion to dismiss the indictment. If the evidence relating to the issue raised by the parties is disputed, the court runs the risk of treading upon the role of the grand jury:

> When a body of citizens, properly chosen and constituted as a grand jury, finds probable cause to believe that a crime has been committed within its jurisdiction, that finding is sufficient to require a trial. The indictment is not evidence, as every petit jury in a criminal case is instructed. The prosecution must still produce evidence from which the trial jury can find every element of the offense proven beyond a reasonable doubt, or the defendant is entitled to a judgment of acquittal. However, the prosecution's evidence is tested at trial, not in a preliminary proceeding.

United States v. Short, 671 F.2d 178, 183 (1982); see also Levin, 973 F.2d at 472 (Boyce, J., dissenting) (decrying "the district court's pre-trial decision that the government would not be able to establish the requisite criminal intent at trial [as being], in essence, a decision that the indictment was based on insufficient or inadequate evidence").

"Whether or not a prosecution under § 875(c) encroaches on constitutionally protected speech is a question appropriately decided by the Court as a threshold matter." United States v. Baker, 890 F. Supp. 1375, 1385 (E.D. Mich. 1995). In the instant case, the Defendant argues that the video is protected by the First Amendment because it does not constitute a true threat. In its response, the Government states that most cases arising under 18 U.S.C. § 875(c) turn upon their

6

particular facts and cannot be decided on a pretrial motion to dismiss. See Baker, 890 F. Supp. at 1385. Nevertheless, the Government does not point to facts that are in dispute in this case but, instead, argues the legal issue, contending that the video is a true threat under the case law.[2] At the September 16 hearing on the motion to dismiss, defense counsel stated that he first believed that his arguments regarding whether the video constituted a threat under the statute would be defenses to present to the jury, but as he researched the issue, he found that the courts were examining the issue as one of law.

While the issue of whether an expression or utterance constitutes a true threat or constitutionally protected speech is a question of law, the Court cannot find that the essential facts, relevant to that determination in this case, are undisputed. Although the parties appear to agree that the Defendant loaded the "Daughter's Love" video onto the YouTube website on the Internet, it is not clear to the Court that particular action was his only means of disseminating the video. The Defendant contends that viewers find videos on YouTube in one of two main ways: (1) Using YouTube's search function or (2) following a link to the video provided in an email or on another Internet site. The Defendant asserts that it is unlikely Chancellor Moyers searched for the video as it did not mention Moyer's name and that there is no allegation that the Defendant sent the link to Chancellor Moyers. Accordingly, he argues that the Defendant's act of adding his video to the some 100 million videos on YouTube did not constitute a true threat as it was not done in a way that it could have intimidated or effected change.

---

[2]The Court notes that during argument on the motion to dismiss, the Government responded to a hypothetical regarding the reasonable recipient of a letter containing a threat to harm some third party that the matter presents a jury question. Nevertheless, the Government did not challenge defense counsel's assertion that the "contextual" facts in this case are undisputed.

7

The facts presented at the detention hearing contradict the Defendant's assertions about the manner in which the Defendant's video was disseminated. At the September 1, 2010 detention hearing, the Defendant's sister Candace Jane Sutton testified that on the day the Defendant's video was placed on the Internet, she first saw it when it was linked to her Facebook page. Ms. Sutton did not explain who had provided the link. The facts regarding the further dissemination of the video, how it came to Chancellor Moyers' attention, and the reasonable likelihood of such were not clearly developed in the record. Ms. Sutton's testimony regarding seeing the link to the Defendant's video on her Facebook account calls into question the Defendant's assertions about the likelihood of Chancellor Moyers seeing the Defendant's videos based upon the nature of YouTube and its features: "[T]he only realistic way Moyers would run across this video online would be if he were to go to YouTube.com and search for 'Dale Jeffries,' and then watch all of Jeffries' many videos. . . . . In short, Jeffries' act of uploading this video to YouTube, standing alone, was extremely unlikely to attract the attention of Chancellor Moyers." [Doc. 23, p.11].

Contrary to the Defendant's assertions, if he provided "a direct reference" to his video by linking it to others' Facebook accounts, the context of the legal question before the Court changes. Accordingly, the Court finds that the resolution of whether the Defendant's video constitutes a true threat cannot be determined without a trial of the general issue to determine how the Defendant's video was disseminated, by whom, and to whom. Thus, the Court finds that in this case, the nature and extent of the alleged threat and whether its dissemination constituted a "true threat" are factual matters to be determined by the jury after seeing and hearing all the evidence. The Court recommends that the Defendant's Motion to Dismiss Indictment [Doc. 22] be denied because it cannot properly be decided before trial.

## B. True Threat

In the event that the District Court disagrees with this Court's determination that the facts are in dispute and, thus, the matter cannot be disposed of before trial, the Court will also address the Defendant's substantive issue: Whether the July 9, 2010 video constitutes a true threat or is, instead, constitutionally protected speech as a matter of law. For the purposes of this analysis, the Court finds the following facts:

> (1) The Defendant created the video "Daughter's Love[;]"
>
> (2) the video contains statements about killing and bombing judges;
>
> (3) the threatening statements in the video are directed toward Chancellor Moyers, although he is not named, as shown by the overall context of the words in the video, including the Defendant's opening statement that "[t]his song's for you, judge" and closing command to "[d]o the right thing July 14[;]"
>
> (4) the Defendant posted the video to the Internet website YouTube.com;
>
> (5) the Defendant or someone else who viewed the video linked it to the Defendant's sister's Facebook page, thereby bringing it to the attention of the Defendant's sister and all of her "friends"[3] on

---

[3]"Facebook developed and operates what is now one of the most popular social networking websites. The Facebook website allows users to create user profiles, join networks and 'friend' other users, which creates online communities with shared interests and connections." Facebook, Inc. v. Power Ventures, Inc., No. C 08-5780 JF (RS), 2009 WL 1299698, *1 (N.D. Cal. May 11, 2009) (internal citation to court documents omitted). When someone receives a post on their Facebook account it can be seen by that individual's Facebook "friends" or, potentially, anyone on Facebook, if the individual has not activated certain privacy settings. See generally, Lane v. Facebook, Inc., No. C 08-3845 RS, 2009 WL 3458198, *1& n.1 (N. D. Cal. Oct. 23, 2009) (observing that "[g]enerally, under the [Beacon] program, if a member of Facebook visited one of the participating websites, it could then transmit information regarding the member's activities on the website to Facebook. In turn, Facebook could post the information on the member's Facebook 'wall' and distribute it to the 'newsfeeds' of the member's Facebook 'friends
'" and noting that the "actual scope of disclosure would depend on various account privacy settings employed by the Facebook member and that member's friends"); Harris v. Blockbuster

9

Facebook;

(6) neither the Defendant, nor his sister, directly communicated the Defendant's video or a link to the video to Chancellor Moyers; and

(7) Chancellor Moyers eventually saw the video.[4]

The Indictment [Doc. 2] charges the Defendant with a violation of 18 U.S.C. § 875(c) as follows:

> The Grand Jury charges that, on or before July 9, 2010, in the Eastern District of Tennessee, the defendant, FRANKLIN DELANO JEFFRIES II, knowingly did transmit in interstate commerce a communication, namely a video of himself posted on the public internet website "YouTube," to Knox County Chancellor Michael W. Moyers, and the communication specifically contained a threat to injure an kill Knox County Chancellor Michael W. Moyers[.]

The Defendant contends that this charge must be dismissed because a reasonable person would not believe that he posted the video on YouTube with the intent to intimidate Chancellor Moyers in order to cause him to take any action, as is required for his actions to be a true threat.

Section 875(c) provides that

> [w]hoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both.

Section 875(c) contains three elements: "(1) a transmission in interstate commerce; (2) a

---

Inc., 622 F. Supp. 2d 396, 397 (N.D. Tex. 2009) (describing the facts giving rise to the legal issue as "when a customer rented a video from Blockbuster Online, the Beacon program would transmit the customer's choice to Facebook, which would then broadcast the choice to the customer's Facebook friends").

[4]The Defendant admits this fact in his brief, although the Court has not been apprised of how Chancellor Moyers learned about the video. The Defendant states that "it appears that a family member contacted another judge through whom court security and Chancellor Moyers were informed of the video." [Doc. 23, p.16]

10

communication containing a threat; and (3) the threat must be a threat to injure the person of another." United States v. DeAndino, 958 F.2d 146, 148 (6th Cir. 1992). The Sixth Circuit has determined that section 875(c) requires a finding of general intent on the part of the perpetrator. Id. In other words, the government does not have to show that the defendant specifically intended to threaten another but, instead, must prove that a "reasonable person [would] consider the statement to be a threat" based on "the surrounding facts and circumstances." Id.

In the present case, the controversy centers on the second element of section 875(c), whether the video in question contains an actual or true threat. The Sixth Circuit has determined that a true threat under section 875(c) contains two components:

> [T]o constitute "a communication containing a threat" under Section 875(c), a communication must be such that a reasonable person (1) would take the statement as a serious expression of an intention to inflict bodily harm (the mens rea), and (2) would perceive such expression as being communicated to effect some change or achieve some goal through intimidation (the actus reus).

United States v. Alkhabaz, 104 F.3d 1492, 1495 (6th Cir. 1997). The Court held that both the mens rea and the actus reus "must be determined objectively" and that the actus reus element is determined from the perspective of a reasonable person receiving the alleged threat. Id. at 1496. Applying these rules to the facts of that case, the Court concluded that the communications in that case (emails between the defendant and another man discussing shared sexual fantasies involving the torture and murder of women), even if taken as serious expressions of the men's intentions to inflict bodily harm, would not be perceived by a reasonable person as being sent to cause some change or achieve a goal through intimidation. Id. at 1496.

In the present case, the Defendant argues that the present facts show that the Government cannot prove the actus reus component of a true threat. He contends that a reasonable person would

11

not deem his posting of his video on YouTube to be a communication of the video in order to cause change or to realize a goal through intimidating another because the nature of YouTube makes it extremely unlikely that the video would ever be viewed by Chancellor Moyers. In this regard, he asserts that well over 100 million videos are available on YouTube. He argues that in order to find a particular video on YouTube, a viewer can either use YouTube's search function to search the names and descriptions of videos using keywords or the viewer can follow a direct link to a YouTube video provided by email or on another Internet website. The Defendant maintains that there is no allegation that he provided a direct link to his video to Chancellor Moyers. He also contends that it was extremely unlikely that Chancellor Moyers searched YouTube using the names of litigants appearing before him. Accordingly, he concludes that his posting of the video on YouTube is akin to writing a threat on a piece of paper that is then placed in a bottle and thrown into the ocean or posted on the bulletin board of a public library in another city. He agrees that it is not impossible that the victim of the alleged threat would learn of the threat, either by coming upon it himself or learning about it from another, but that it is so unlikely that no reasonable person would believe that the person authoring the threat posted it to further the goal of intimidating the victim.

The Government argues that the Defendant's focus on the likelihood of the victim receiving the threat is misplaced. It asserts that the crime is completed upon the communication of the threat–in this case, the Defendant's posting of the video on YouTube–and does not turn upon the victim's receipt of or likely receipt of the threat. Instead, the Government contends that the test focuses solely upon whether a reasonable person would perceive the Defendant intended the video to intimidate. "In this sense, the Alkhabaz test presupposes that the expression will be received and merely gauges the reasonableness of the receiver's reaction." [Doc. 28, p.11] The Government

12

argues that a reasonable person receiving the Defendant's video would perceive it as intending to intimidate Chancellor Moyers. It points to specific language in the video as showing that the Defendant intended for his threatening message to reach Chancellor Moyers: The Defendant states that he is "making this video public," is "telling you right now live on the internet," and does not care "if everybody sees this internet site." The Government also notes statements in the video that it claims show that the Defendant had considered that the video might reach law enforcement: The Defendant says that he does "not care if [he] go[es] to jail for 2,000 years," that he is "willing to go to prison," and that the receiver should "put [him] in jail and make a big scene." Finally, the Government argues that on the video, the Defendant tells Chancellor Moyers that if he does not "stop" inflicting abuse on the Defendant's daughter, then the Defendant will kill him, will come after him after court, and will blow up his car. It argues that these statements show that the Defendant intended to intimidate Chancellor Moyers into acting or refraining from acting in a certain way regarding the Defendant's custody dispute.

That the intended victim actually receive the threat is not a necessary component of a true threat. First, the plain language of section 875(c) does not require that the intended victim receive the threat but, instead, prohibits "any communication" that contains a threat to injure or kidnap and that is transmitted in interstate commerce. See United States v. Calor, 340 F.3d 428, 431 (6th Cir. 2003) (observing that statutory construction begins with the plain language of the statute).

In developing its two part test for a true threat, the Sixth Circuit rejected a requirement that the threat be communicated to the threatened person or to a third party connected to the threatened person in some way. Alkhabaz, 104 F.3d at 1495. Instead, the appellate court chose to focus on "the type of offense that Congress intended to prohibit when it enacted Section 875(c)." Id. In so

13

doing, it observed that individuals use threats when they want to reach some goal through intimidation. Id. "Although it may offend our sensibilities, a communication objectively indicating a serious expression of an intention to inflict bodily harm cannot constitute a threat unless the communication also is conveyed for the purpose of furthering some goal through the use of intimidation." Id.

The undersigned finds that discerning this prong of the test involves looking both to the content of the threat (would a reasonable person believe that the words used evinced an intent to intimidate) and the context or manner in which it was conveyed or communicated (would a reasonable person believe that the threat was conveyed in such a way that it shows an intent to intimidate). In Alkhabaz, the court found that both the content of the messages (shared sexual fantasies) and the way in which they were conveyed (private email messages between two friends) revealed that the messages did not constitute a true threat. Id. at 1496; see also United States v. Hankins, 195 F. App'x 295, 301 (6th Cir. 2006) (reasoning that both the content and the context of the defendant's statements, made to a friend in the defendant's home, were relevant to determining whether the statements were a true threat).

The Supreme Court has also looked to the context in which an alleged threat is made to determine if it is a true threat. Watts v. United States, 394 U.S. 705, 708 (1969) (per curiam). In Watts, the Supreme Court considered whether the defendant's statement to a crowd at a public rally on the grounds of the Washington Monument that he would refuse to be drafted and if made to carry a firearm, he would want to aim it at the President, constituted a true threat under 18 U.S.C. § 871(a).[5] Id. at 706. The Supreme Court found that "the kind of political hyperbole indulged in

---

[5] At the time, section 871(a) provided as follows:

14

Case 3:10-cr-00100  Document 31  Filed 10/22/10  Page 14 of 20 PageID #: 106

by petitioner" did not constitute a true threat. Id. at 708. It determined that Watts' statements were instead crude political opposition to the President and, thus, were protected by the First Amendment. Id. "Taken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners [who laughed along with Watts when he made the statements], we do not see how it could be interpreted otherwise." Id.

Thus, the context of the threat including the facts and circumstances surrounding its communication are highly relevant to the determination of whether it constitutes a true threat. In United States v. Morales, the Fifth Circuit considered whether a threat to kill unnamed students and teachers at a certain Houston, Texas high school, which threat the defendant made to a third party in an Internet chat room, constituted a true threat under section 875(c). 272 F.3d 284, 285-86 (5th Cir. 2001), cert. denied, 536 U.S. 941 (2002). The defendant argued that his statements were not a true threat as a matter of law "because they were made to a random third party who had no connection with [the named] High School." Id. at 288. The court rejected this contention, stating that the "focus" of the inquiry was "whether the threat 'in its context would have a reasonable tendency to create apprehension that its originator will act according to its tenor.'" Id. (quoting

> Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of or to inflict bodily harm upon the President of the United States, the President-elect, the Vice President or other officer next in the order of succession to the office of President of the United States, or the Vice President-elect, or knowingly and willfully otherwise makes any such threat against the President, President-elect, Vice President or other officer next in the order of succession to the office of President, or Vice President-elect, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

15

United States v. Myers, 104 F.3d 76, 78 (5th Cir. 1997)). "It is this character and context of the threat that is the relevant test." Id. Then, the court referenced its earlier observations about the context of the statements in question: That the third party had felt apprehension that the defendant would act on the threat, that the defendant had repeated the threat several times over the course of the short online chat, that the defendant "gave no indication that he was joking," that the defendant tried to reference the well-known school shooting at Columbine High School, and that the defendant was not taking part in a public political debate like the defendant in Watts at the time he made the statements. Id. Based upon the context of Morales' statements, the court found the statements to be a true threat despite the fact that they were made to a random third party in an Internet chat room. Id.

Turning to the instant case, the Court agrees with the Government that a reasonable person viewing the *content* of the Defendant's video would believe that it was made with the intent to intimidate Chancellor Moyers in order to influence his future rulings/actions regarding the custody dispute over the Defendant's daughter. The Defendant's closing statements instruct the judge to "Be my friend. Do something right. Serve my daughter." Then, the Defendant places his face close to the camera and says "Yeah, look at that. That's the evil. You better keep me on God's side. Do the right thing on July 14th." Moreover, like the defendant in Morales, the instant Defendant repeated the threat to kill or injure several times during the video and gave no indication that he was joking. The Court finds that a reasonable person viewing this video in light of the surrounding circumstances (i.e., knowing about the custody dispute, the history with Chancellor Moyers, and the upcoming hearing on July 14, 2010) would believe that the Defendant made these statements in order to intimidate Chancellor Moyers into acting favorably toward the Defendant's case at the July

16

14 hearing.

The heart of the controversy in this case is the *context* in which the video was communicated or conveyed. Would a reasonable person believe the Defendant's acts of posting his video on YouTube and possibly posting a link to it on his sister's Facebook account show his intent to intimidate Chancellor Moyers? Although the ultimate indictment in Alkhabaz concerned emailed messages that were "not available on any publicly accessible portion of the Internet," the criminal complaint had referenced a short story by the defendant that he posted on an Internet forum called "alt.sex.stories" that detailed the "torture, rape, and murder of a young woman who shared the name of one of [the defendant's] classmates." Id. at 1493. In his dissent, Judge Krupansky disagreed with the test established by the majority but also found that even under the majority's test, a reasonable person could conclude that the defendant had a general intent to cause some change through intimidation based upon this story posted on the Internet: "By publishing his sadistic Jane Doe story on the Internet, [the defendant] could reasonably foresee that his threats to harm Jane Doe would ultimately be communicated to her (as they were), and would cause her fear and intimidation, which in fact ultimately occurred." Id. at 1506 (Krupansky, J., dissenting).

In the present case, the Defendant communicated his video to a public forum, YouTube. As far as the Court is aware, there were no restrictions on who could access his video on that site. The Defendant argues that his video was lost in the sheer volume of videos on YouTube, but the Court finds that it was reasonably foreseeable both to the Defendant and to a reasonable person that his threats to harm Chancellor Moyers would be communicated to Moyers. The language of the video, as pointed out by the Government above, shows that the Defendant believed that Chancellor Moyers would receive the video. The fact that the Defendant posted the video on a public forum would

17

cause a reasonable person to believe that it could ultimately be communicated to Chancellor Moyers. This finding is further supported by considering that the Defendant (or someone who viewed or knew about the video) linked it to the Defendant's sister's Facebook account, where it was directed to persons with knowledge of the circumstances surrounding the custody dispute.[6] Once the video was disseminated to this group of people, the Court finds that it was reasonably foreseeable both to the Defendant and to a reasonable person that the Defendant's threats to harm Chancellor Moyers would be communicated to Moyers. In light of these facts, a reasonable person could conclude that the way in which the Defendant conveyed his video shows an intent to intimidate Chancellor Moyers.

Although the Defendant likens the posting of the video on YouTube to writing a threat on a paper and then placing it in a bottle or on a library bulletin board in another city, the Court believes a better analogy would be the shouting of his message to a large crowd engaged in their own pursuits. Many people would not hear the Defendant's message, just as millions of Internet users would never view the Defendant's video posted on YouTube. Likewise, some people overhearing the Defendant's proclamation or performance would continue to go about their own business. Nevertheless, it is reasonably foreseeable that some persons would be concerned by the content of the Defendant's song and statements and the serious and angry way in which he delivered them and would report the matter to some authority, law enforcement entity, or court official, such as actually happened in this case. If the Defendant shouted his message to a crowd of people who had

---

[6]The Third Circuit approved the sufficiency of the evidence supporting a section 875(c) conviction in a case in which the defendant had posted threatening statements to a social networking site (MySpace) that could be viewed by persons on his "buddy list." United States v. Voneida, 337 F. App'x 246, 249 (3rd Cir. 2009) (unpublished) (rejecting def's argument that his statements were like a hand-written diary and, thus, were not transmitted in interstate commerce).

knowledge about the circumstances of his custody dispute, like his sister and potentially her friends on Facebook, the likelihood that someone would report the threat only increases.

The Defendant argues that his video is protected by the First Amendment because it, like the defendant's statements in Watts, is a political statement, even if unpleasant, inappropriate, or intemperate. The Defendant's video does contain a few statements that could be considered to be political opposition to the way that fathers are treated in the court system, but the bulk of the statements in the video are directed at Chancellor Moyers and are in no way political statements. Unlike in Watts, in which the Court held that the conditional nature and the context of the statement showed it was political hyperbole, 394 U.S. at 708, here the context and content of the video as a whole reveal that it is a true threat. The Defendant's threat to kill or injure Chancellor Moyers was conditioned only on Moyers not bowing to the Defendant's wishes, which is the very definition of intimidation. Moreover, as noted above, the Defendant's demeanor on the video is serious and angry, not one of levity like the defendant in Watts. Finally, the Defendant's statements were not made at a political rally or debate. Thus, the protections of the First Amendment do not extend to the Defendant's video despite its reference to some political issues.

In sum, the Court finds that a reasonable person viewing the Defendant's video would consider it to be a "a serious expression of an intention to inflict bodily harm" and "communicated to effect some change or achieve some goal through intimidation[.]" See Alkhabaz, 104 F.3d at 1495. Because the Court finds that the Defendant's video is a true threat, the video is not protected by the First Amendment, and the Defendant's argument that his video is an artistic performance is unavailing. See Virginia v. Black, 538 U.S. 343, 359 (2003) (holding that the First Amendment does not protect true threats); Landham, 251 F.3d at 1080 (observing that "it is well established that

19

true threats, unlike political hyperbole and other protected speech, are not protected by the First Amendment"). Thus, the Court recommends that the Defendant's Motion to Dismiss Indictment be denied.

## IV. CONCLUSION

After careful consideration of the motion, the parties' filings, oral argument, and the relevant legal authorities, the Court finds that the question raised by the Defendant is a matter for the jury to resolve at trial. Alternatively, the Court finds that the Indictment alleges facts that, if proven at trial, would satisfy the statutory elements of 18 U.S.C. § 875(c). Accordingly, for the reasons set forth herein, the Court **RECOMMENDS** that the Defendant's Motion to Dismiss Indictment [**Doc. 22**] be **DENIED**.[7]

> Respectfully submitted,
>
> s/ C. Clifford Shirley, Jr.
> United States Magistrate Judge

---

[7] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).